ATKINSON and Others *v.* ALLEN, Administrator, &c.

EVIDENCE.—CUSTOM.—Written contract between A and B, for the purchase, killing and packing of hogs. By its express terms, the hogs were to be killed and packed by B, "on joint account, each party to have one-half interest."

*Held,* that evidence of the existence of a custom among those engaged in the business of packing pork in the city of L, and at two or three other points in the State of *Kentucky,* that when under such a contract the packers themselves slaughtered the hogs, they were entitled, to the exclusion of the other contracting party, to the profits on the sale of the bristles, gut fat and grease from the hogs packed, was inadmissible, as being in direct conflict with the express terms of the contract.

APPEAL from the *Owen* Common Pleas.

RAY, J.—The question presented by this record is whether in an action involving the rights of the parties to the contract hereinafter set forth, it was proper to prove the existence of a custom among the persons engaged in the business of packing pork in the city of *Louisville,* and at two or three other points in the State of *Kentucky,* that when, under such a contract, the packers themselves slaughtered the hogs, they were entitled, to the exclusion of the other contracting party, to the profits on the sale of the bristles, gut fat and grease from the hogs packed.

The contract was as follows: " *Greencastle, Indiana, March* 22, 1860.—Memorandum of contract made this day between *John McKee,* of *Putnam county, Indiana,* and *Atkinson, Thomas & Co.,* of *Louisville, Kentucky.* Said *McKee* and *Atkinson, Thomas & Co.* have this day agreed to purchase from one thousand to two thousand well fatted hogs, to be killed and packed by *Atkinson, Thomas & Co.,* during the packing season of 1860-61, on joint account, on the following terms: Said *McKee* is to buy the hogs at whatever price he and *Atkinson, Thomas & Co.* will agree upon, free of charge for his services. *Atkinson, Thomas & Co.* agree to furnish all the money to pay for said hogs, save one dollar per hog, which said *McKee* is to furnish as a margin. *Atkinson, Thomas & Co.* to charge the joint account 9 per cent.

per annum, and to make no charge for storage or commission, said *McKee* to have the privilege of selling his interest at any time after the hogs are slaughtered. The joint account is to be charged with the whole expense of getting up the hogs. Said *Atkinson, Thomas & Co.* also agree to furnish said *McKee* with money during the summer to advance on hogs as he may make purchases. Each party to have one-half interest. (Sig'd) John McKee. Atkinson, Thomas & Co."

The court permitted proof of the existence of such a custom, but instructed the jury that such custom could not change the rights of *McKee* under the contract, unless known to him, or unless he was in possession of such facts and circumstances as would readily lead him to believe that such custom did exist at *Louisville*. There was no proof on the trial that *McKee* knew of the custom claimed to exist, and the finding of the jury was in his favor.

On the trial, *William H. Merrewether*, one of the appellants, testified that the profits of slaughtering and packing hogs went as perquisites to the slaughterer, and were never accounted for to the person for whom or on whose account such hogs were slaughtered and packed. Such was the custom at *Louisville, Frankfort, Maysville* and *Bowling Green*, the principal packing places in *Kentucky*. *Thomas J. Martin*, who had been in the business in *Louisville* for over thirty years, gave the same evidence as to the custom in said city. *William Hughes*, a witness for appellants, stated that the house of which he was a member had frequently made contracts like the one in question, and always claimed the profits of the killing as perquisites, and believed such to be the custom. *E. L. Huffman*, who claimed to have been engaged in pork packing longer than any other house in *Louisville*, also testified to such a custom.

By the express terms of the contract, the hogs were "to be killed and packed by *Atkinson, Thomas & Co.* on joint account, each party to have one-half interest." As the killing was on "joint account," proof that by custom in the city of *Louisville*, under such a contract, the entire profit of

that part of the transaction was to be received by one con-
tracting party was simply proof of a custom in direct con-
flict with the stipulation of the parties.   The record also
discloses that a custom was proved by one of the appellants,
that under such a contract the entire profit of the packing
should also go to the packer, and as the "packing" is by the
contract no more on "joint account" than the "killing,"
such a custom would be equally reasonable, and if recog-
nized by the courts, would doubtless, to the perfect satisfac-
tion of the packer, end all disputes under such contracts.
The written agreement only contemplates a partnership in
the killing and packing, and does not provide that the pork
when packed shall be held by the partnership for an advance
in price.   Either party might, therefore, require the joint
venture to be closed at once, the result being, of course,
that all profits contemplated by the contract are, according
to the custom in the city of *Louisville*, claimed by the
packer, although the killing and packing has been done on
joint account.   There are, however, authorities somewhat
adverse to the recognition by the courts of a custom thus in
direct conflict with both the letter and the spirit of the con-
tract.   Thus, in *Allen* v. *Dykers et al.*, 3 Hill 593, it was held
that evidence of a usage, general or particular, among
brokers, though known to the agent of the party who made
a special contract, was inadmissible when it contradicted
the fair and legal import of the written contract.   And in
*Hinton* v. *Locke*, 5 Hill 437, it is said that usage is never ad-
missible, when it contradicts the agreement of parties.   In
*Gross et al.* v. *Criss*, 3 Grattan (Va.) 262, it was considered that
where the meaning of the terms used in a letter of instruc-
tion is plain and unequivocal, it is not proper to admit evi-
dence of a local usage or understanding to give a different
meaning to the terms of the letter.   In *Wetherill* v. *Neil-
son*, 20 Penn. St. 448, it was well said: "The courts
must be allowed to understand common English, without
the aid of witnesses.   The law is that mere representation
does not constitute a warranty.   If we admit evidence of

this special custom, we allow the law to be changed by the testimony of witnesses, or by the soda dealers of *Philadelphia.*" The Supreme Court of *Pennsylvania,* in *Coxe* v. *Heisley,* 19 Penn. St. 243, declaring their purpose to return to the sounder rule which had been announced in the earlier cases in that court, declare : " A local usage, if it be ancient, uniform, notorious and reasonable, may enter into and become part of a contract which is to be executed at a place where the usage prevails; but here, as elsewhere, it is checked by this wholesome limitation, that it must not conflict with the settled rules of law, nor go to defeat the essential terms of the contract." The same rule was recognized in *Hutton* v. *Warran,* 1 Mes. & Wels. 466, and in *Magee* v. *Atkinson,* 2 *id.* 440. It was held in *Yates* v. *Pym,* 6 Taun. 446, that " on a warranty of prime singed bacon, evidence is not admissible of a practice in the bacon trade to receive bacon to a certain degree tainted as prime singed bacon."

There are also authorities which hold that evidence of a local usage cannot be received unless it be expressly proved to have been known to the parties, and that they contracted with reference to its terms. *Wheeler* v. *Newbould,* 5 Duer 29.

We have been referred to the case of *Wallace* v. *Morgan et al.,* 23 Ind. 399, as admitting that a local usage may control the terms of a contract. That case simply admits that where a party ships goods to a commission merchant, to be sold, and there exists a custom well defined, in general use at the place where the goods are received, and so well settled that persons in the trade must be considered as contracting with reference to it, it may to some extent qualify the duty or liability of the consignee, which would otherwise be implied in law, by his act of receiving the goods. The language of Justice MARSHALL is quoted with approval, that "such custom must indeed be in subordination to the general and more authoritative law of the country or state in which the particular place is situated, and should have the qualities of universality, continuance, &c., belonging to a

good custom." But the question whether such custom could be permitted to contradict the plain and express contract of the parties was not before this court, nor was it considered whether actual notice of the existence of a local custom was necessary to permit its introduction. Nor do we now decide that question, as we are convinced that the proof offered in this case should have been rejected, as tending to defeat the essential terms of the contract. Rejecting, therefore, all proof of such custom, we find the verdict fully sustained by the evidence.

The judgment is affirmed, with costs.

*J. A. Matson,* for appellants.

*D. E. Williamson* and *A. Daggy,* for appellee.