Scott *et al. v.* Hartley.

No. 14,434.

SCOTT ET AL. *v.* HARTLEY.

USAGE.—*Answer Alleging.*—*Insufficiency of.*—In an action based upon a written contract entered into between the plaintiff and the defendants, by the terms of which the plaintiff sold and agreed to deliver to the defendants, at Philadelphia, a specified number of bushels of corn, the time and place of delivery and the price and time of payment being definitely fixed, the price to be paid for the corn being 50½ cents per bushel net on the track at Philadelphia, an answer is bad which pleads as a reason for the refusal of the defendants to receive and pay for the corn, a custom or usage " that when grain was purchased in Indiana, to be delivered in Philadelphia or other cities in the eastern States, the delivery to be made by the seller to the purchaser or his consignee in any such city at a stated price on the 'track' or 'net' or 'net track,' such grain was to be delivered on the railroad track at such city without the payment of freight by the seller, and that the purchaser and not the seller should receive such grain, and pay the freight thereon from the place of shipment to the place of delivery and then charge the amount of the freight, so paid, back to the seller and deduct it from the purchase price of the grain and then fix the net price." There is no uncertainty or ambiguity in the contract under consideration. The word " net," as employed therein, has a clear, fixed, definite meaning.

SAME.—*Parol Evidence of.*—*Inadmissibility of to Vary Written Contract.*— Parol evidence of a usage or custom is not admissible for the purpose of varying the terms or conditions of a written contract when the contract is free from uncertainty or ambiguity.

From the Marion Superior Court.

*A. J. Beveridge* and *J. S. Tarkington,* for appellants.
*T. L. Sullivan* and *A. Q. Jones,* for appellee.

BERKSHIRE, C. J.—This is an action upon a contract entered into by telegram and letter.

It is a contract in writing, and therefore the rules governing written contracts must be applied in determining the rights of the parties.

By the contract the appellee sold and agreed to deliver to the appellants 7,500 bushels of corn, the place of delivery being Philadelphia, Pennsylvania.

The complaint alleges a delivery of the corn at the place,

and within the time agreed upon, and a refusal on the part of the appellants to receive and pay for the same, to the appellee's damage, etc.

The telegrams and letter of which the contract is composed read as follows :

TELEGRAMS.

" INDIANAPOLIS, IND., March 1st, 1887.

*"To C. W. Hartley :*

" Will pay fifty and one half net, track, Philadelphia Union Line, two corn, quick reply, prompt shipment.

" WM. SCOTT & CO."

" MARCH 1st, 1887.

*"To Wm. Scott & Co., Indianapolis :*

" Will sell you fifteen cars.   Ship ten (10) days.

" C. W. HARTLEY."

" INDIANAPOLIS, IND., March 1st, 1887.

*"To C. W. Hartley :*

" We accept fifteen cars, seventy-five hundred bushels, two corn, terms stated.   If intended loading heavier name number extra cars that basis.   We can use any grading, steamer cut, quarter off, or do you prefer market difference on arrival?   Reply.                    WM. SCOTT & CO."

LETTER.

" INDIANAPOLIS, March 1st, 1887.

*"C. W. Hartley, Goodland, Ind. :*

" DEAR SIR :   We confirm purchase from you of 15 cars, No. 2 mix corn at $50\frac{1}{2}$ del'd Phil'a, Penn., terms $1\frac{1}{4}$ off grades steamer, 500 bins to the car, 10 days' shipment.   When anything more to offer we would be glad to hear from you. Corn closes shade lower this P. M.

" Truly yours,          WM. SCOTT & CO."

TELEGRAM.

" MARCH 1st, 1887.

*" To Wm. Scott & Co., Indianapolis, Ind. :*

" Seventy-five hundred is the trade, one and one-fourth off for steamer.                    C. W. HARTLEY."

The appellants submitted a demurrer to the complaint, which the court overruled, and they reserved an exception. They then filed an answer and a cross-complaint, to which the appellee filed demurrers, which were sustained, and the appellants had an exception noted.

The appellants elected to stand by their answer and cross-complaint, and refused to plead further. Whereupon, after due inquiry, the court gave judgment for the appellee.

The foregoing proceedings having occurred at special term, the appellants appealed to general term, and assigned errors as follows: (1) The court erred in overruling the demurrer to the complaint; (2) in sustaining the demurrer to the answer; (3) in sustaining the demurrer to the cross-complaint.

The court, in general term, affirmed the judgment at special term, and the appellants prosecute this appeal.

Counsel for the appellants do not urge the first error. There was but one paragraph in the answer, and the cross-complaint was likewise limited.

There is no question arising upon the third error that is not presented by the second. We will, therefore, confine ourselves to a consideration of the answer. As we have said already, the answer is in but one paragraph.

The appellants claim immunity from liability because of their failure to receive and pay for the corn by reason of a custom or usage which they insist prevailed among grain dealers and entered into and formed a part of the written contract.

The answer alleges that long before and at the time the contract was made, it was " the well known, usual, general, uniform and reasonable usage, and the known and usual course of trade and business of persons engaged in the said business of the purchase and sale of grain, that when grain was purchased in Indiana to be delivered in Philadelphia or other cities in the eastern States, the delivery to be made

by the seller to the purchaser or his consignee in any such city at a stated price on the 'track' or 'net' or 'net track,' such grain was to be delivered on the railroad track at such city without the payment of freight by the seller, and that the purchaser and not the seller should receive such grain and pay the freight thereon from the place of shipment to the place of delivery, and thereupon charge the amount of the freight, so paid, back to the seller and deduct it from the purchase-price of the grain, and thus fix the net price." It is then alleged, " and accordingly it was the general usage in said business and trade for the purchasers of grain to be shipped to said cities to contract with the transportation companies and pay them for the shipment of such grain at such rate for freight as they might agree upon, and on such contract for freight the price to be offered and paid depended, varying more or less, with the rate of freight charges to be paid by the purchaser under such contract."

No apparent reason appears in the answer why it would be more to the interest of the purchaser that the freight charges should be paid at the place of delivery rather than at the place of shipment.

It is stated in argument, however, that the appellants, or their consignee, belonged to a class of shippers to which transportation companies allowed a rebate, in the nature of a bonus, from regular rates, which was the foundation for the custom or usage alleged, and by the prepayment which the appellee made they were deprived of the benefit of such rebate.

If the facts as given in the argument appeared in the pleading, it might be a question worthy of consideration whether or not a usage resting upon such a foundation would not be against public policy, a question to which we have given no consideration.

The transaction here in question transpired before the act of Congress regulating interstate commerce came into force, and hence we do not consider it with reference to that law.

This brings us to the question more particularly discussed by counsel. Conceding that it sufficiently appears that a usage existed such as the appellants claim, does it enter into and control the rights of the parties under the contract here involved?

We are apprised of the rule contended for by the appellants, but the difficulty is in its application.

Where the terms of a written contract are uncertain or ambiguous they are open to explanation, and parol evidence is admissible of an existing usage or custom if it will tend to clear away the one or to remove the other. So where there are words or phrases peculiar to a trade or business found in a written contract, they are open to explanation by parol evidence, and the same may be said of observations.

To this extent we think the authorities cited by appellants' counsel go, and no further. The authorities which support this rule are abundant.

But there is another rule equally well settled and supported, which excludes parol evidence of a usage or custom for the purpose of varying the terms or conditions of a written contract, when it is free from uncertainty or ambiguity.

The controlling reason in support of this rule is, that if such evidence is allowed, the law makes and enforces a different contract from the one executed by the parties. The proper distinction is made, we think, in the late case of *Smith* v. *Clews*, 114 N. Y. 190. That was an action brought to recover the possession of two diamonds and their settings, called a " pair of diamond ear knobs." The contract involved is as follows:

" NEW YORK, April 12th, 1879.

" Received from Alfred H. Smith & Co., by their representative, B. W. Plumb, a pair of single stone diamond ear knobs, ten and one-eighth carats, of the value of fourteen hundred dollars ' on approval ' to show to my customers. Said knobs to be returned to said A. H. Smith & Co. on demand.

" E. MIERS."

On the trial the plaintiffs offered to prove by a competent witness that there was a peculiar meaning given in the diamond trade to the words " on approval."· The court excluded the evidence. The Court of Appeals held the evidence to be competent, and in support of its conclusion said : " Evidence is always admissible to explain the meaning of terms used in any particular trade, when their meaning is material to construe the contract, and the rule extends to forms of expression as well as to single words. Evidence of usage is also admissible to apply a written contract to the subject-matter of the action, to explain expressions used in a particular sense by particular persons as to particular subjects, to give effect to language in a contract as it was understood by those who made it. * * Upon the face of the contract it does not import an authority to sell. If the words ' on approval' are stricken from the paper, it would appear to be a complete agreement, of plain meaning, in which the authority given is ' to show' the diamonds, and the obligation is absolute ' to return on demand.' Such expressions are wholly inconsistent with an authority ' to sell,' and its meaning could not be plainer if the parties had· inserted after the words ' to show' the words ' but not to sell.' The·words ' on approval,' as ordinarily interpreted, are neither inconsistent with an authority ' to show' or an obligation ' to return on demand.' We must, however, presume that the parties intended some meaning by their use, and, as the meaning does not appear from the context, we have a case *where parol evidence is admissible to enlighten the court, and to show the intent of the parties to the contract."* (Our own italics.)    Our own cases are to the same effect. *Cox* v. *O'Riley,* 4 Ind. 368; *Pribble* v. *Kent,* 10 Ind. 325; *Morningstar* v. *Cunningham,* 110 Ind. 328.

In the last case it is said : " It is to be observed that the contract, out of which the controversy arose, was oral, and the evidence was such as to leave the terms and meaning of the agreement ambiguous.   In such cases, evidence of the

known and usual course of a particular trade or business is competent, with a view of raising a presumption that the transaction in question was according to the ordinary and usual course of the business to which it related." Further on in the opinion it is said : " Parties who are engaged in a particular trade or business, or persons accustomed to deal with those engaged in a particular business, may be presumed to have knowledge of the uniform course of such business. Its usages may, therefore, in the *absence of an agreement to the contrary,* reasonably be supposed to have entered into and formed part of their contracts and understandings in relation to such business, as ordinary incidents thereto."

In the conclusion, and as the summing up of the whole matter, we find the following :

" It was competent, therefore, *in the absence of an agreement to the contrary,* to show that according to the course of business at their pork-house, Henderson, Parks & Co. did not keep the product of each customer's hogs separate." See *Jaqua* v. *Witham, etc., Co.,* 106 Ind. 545 ; *Harper* v. *Pound,* 10 Ind. 32 ; *Atkinson* v. *Allen,* 29 Ind. 375 ; *Biddle* v. *Reed,* 33 Ind. 529 ; *Spears* v. *Ward,* 48 Ind. 541 ; *Seavey* v. *Shurick,* 110 Ind. 494.

In *Brown* v. *Foster,* 113 Mass. 136, it is said : " When an express contract like that shown in the present case was proved to have been made between parties, it was not competent to control it by evidence of a usage. It may be that the very object of the express contract was to avoid the effect of such usage, and no evidence of usage can be admitted to contradict the terms of a contract, or control its legal interpretation and effect."

We find no ambiguity in the language of the contract under consideration. It speaks clearly and unmistakably. The time and place of delivery were definitely fixed ; and the price and time of payment none the less so. Philadelphia was the place, and ten days the time of delivery ; 50½ cents

"net" was the price to be paid on delivery. By the very terms of the contract, had the appellee delivered the corn subject to charges, the appellants could have refused to receive it. They could only have been compelled to receive the corn and pay charges under a contract for so much per bushel in gross, except it had been specially provided that they should pay and deduct from the purchase-price. The word "net" is thus defined :

"Net—that remains after the deduction of all charges or outlay ; as, ' net profits :—clear of all tare or tret or other deductions,' as, ' net weight.' " Worcester's Dict. "Net— also, clear of all charges and deductions ; as, net profit ; net income ; net weight," etc. Webster's Dict. See *Talcott* v. *Smith*, 142 Mass. 542.

In the sense in which the word "net" is used in the contract under consideration, it is the opposite of " gross," used in the same sense. See *Logan* v. *Dockray*, 146 Mass. 296. " Gross—Whole, entire." 9 Am. and Eng. Encyc. of Law, 62. " Gross—Taking in the whole ; having no deduction or abatement ; whole ; total ; as, ' the gross sum ;' ' the gross weight.' " Webster's Dict.

" Gross—Whole ; entire ; total ; as, the gross sum, or gross amount, as opposed to a sum consisting of separate or specified parts." Worcester's Dict.

We think it would hardly be contended, had the contract stipulated that the appellee was to receive 50½ cents per bushel " gross " on delivery, that a custom could have been proven by parol, which would have limited the price to 50½ cents " net," and yet the proposition would be essentially the same as the one here under consideration.

The contention of the appellants, pure and simple, is to allow them to introduce parol evidence for the purpose of transforming the contract which they and the appellee made into another and different contract. They insist that the terms of the contract as written are not its terms, and that the true meaning of the contract is to be found in the usage

which they contend prevailed when the contract was executed.

If there is one proposition better settled than others by a long line of decisions from this court, that proposition is that parol evidence will not be allowed to vary or control the terms and conditions contained in a written contract. The rule is so familiar that we do not feel called upon to refer to the cases, or any of them. It is clear, we think, that this case is within the rule.

On the point that custom and usage can not be given in evidence to contradict the express or implied terms of a contract free from ambiguity, in addition to the cases already cited, see note to *Smith* v. *Clews*, 11 Am. St. Rep. 627, where many cases are collected and cited. Among others cited we call especial attention to *Hopper* v. *Sage*, 112 N. Y. 530.

We find no error in the record.

Judgment affirmed, with costs.

Filed Oct. 31, 1890; petition for a rehearing overruled Jan. 8, 1891.